IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
5:09-HC-2034-FL

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM AND** |
| | ) | **RECOMMENDATION** |
| RANDLE PORTER COOKE, | ) | |
| | ) | |
| Respondent. | ) | |

This case comes before the court for a determination of whether respondent Randle

Porter Cooke ("respondent") is a sexually dangerous person and thereby subject to commitment

under 18 U.S.C. § 4248 ("4248"). The case was referred to the undersigned for an evidentiary

hearing and memorandum and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). [1]   *See*

D.E. 89. For the reasons stated below, it will be recommended that respondent be found to be a

sexually dangerous person and that he be committed pursuant to § 4248.

## APPLICABLE LAW

I.   ADAM WALSH CHILD PROTECTION AND SAFETY ACT OF 2006

A.   Overview

The Adam Walsh Child Protection and Safety Act of 2006 ("Adam Walsh Act" or

"Act"), Pub. L. No. 109-248, § 302, 120 Stat. 587, 619-22 (codified in 18 U.S.C. §§ 4241, 4247,

and 4248), established a program for the civil commitment of individuals in the custody of the

---

[1] The 33 exhibits introduced by the government at the hearing are those listed in the Joint Pretrial Order (D.E. 112 at
4-6). *See* Transcript, Vol. 1 (D.E. 119), at 58:8-20. Respondent introduced one exhibit, Resp. Ex. 1, consisting of
344 pages of medical records for Respondent dating from September 2010. *See id.*, Vol. 2 (D.E. 120), at 54:22 to
55:9. The court introduced five exhibits:  the Apr. 29, 2011 report of the psychologist testifying for respondent,
Joseph Plaud, Ph.D. (D.E. 43-1) (Ct. Ex. 1); the Apr. 7, 2012 report of Dr. Plaud (D.E. 96) (Ct. Ex. 2); Dr. Plaud's
curriculum vitae (D.E. 35-2) (Ct. Ex. 3); the June 16, 2011 report of the psychiatrist testifying for Respondent,
Moira Artigues, M.D. (D.E. 57) (Ct. Ex. 4); and Dr. Artigues' curriculum vitae (D.E. 106) (Ct. Ex. 5). *Id.*, Vol. 2, at
221:9 to 222:5.

Federal Bureau of Prisons ("BOP"), and others, who are determined to be "sexually dangerous person[s]." 18 U.S.C. § 4248(d). The commitment process is initiated when either the Attorney General, the Director of BOP, or their designee files a certification that an individual is sexually dangerous pursuant to the Act. *Id.* (a); *United States v. Timms*, 664 F.3d 436, 439 (4th Cir.), *cert. denied*, ___ U.S. ___, 133 S. Ct. 189 (2012). Following such certification, the district court must conduct a hearing to determine if the person is sexually dangerous. 18 U.S.C. § 4248(d). "If, after the hearing, the court finds by clear and convincing evidence that the person is a sexually dangerous person, the court shall commit the person to the custody of the Attorney General." *Id.* (d).

A "sexually dangerous person" is defined by statute as one "who has engaged or attempted to engage in sexually violent conduct or child molestation and who is sexually dangerous to others." 18 U.S.C. § 4247(a)(5). The phrase "sexually dangerous to others" means that "the person suffers from a serious mental illness, abnormality, or disorder as a result of which he would have serious difficulty in refraining from sexually violent conduct or child molestation if released." 18 U.S.C. § 4247(a)(6). Thus, to satisfy the criteria for civil commitment under § 4248, the government must show by clear and convincing evidence that an individual: (1) has previously "engaged or attempted to engage in sexually violent conduct or child molestation"; (2) currently "suffers from a serious mental illness, abnormality, or disorder"; and (3) "as a result of" such condition, "would have serious difficulty in refraining from sexually violent conduct or child molestation if released." 18 U.S.C. § 4247(a)(5), (6); *see United States v. Comstock*, __ U.S. __, 130 S. Ct. 1949, 1954 (2010). Each of these elements will be reviewed in further detail below.

### B.      Prior Sexually Violent Conduct or Child Molestation

"Child molestation" is not defined by the Act. However, BOP regulations define it as "any unlawful conduct of a sexual nature with, or sexual exploitation of, a person under the age of 18 years." 28 C.F.R. § 549.93. The Act also does not specifically define "sexually violent conduct," but BOP regulations do, *see* 28 C.F.R. § 549.92. Sexually violent conduct under §4248 need not be criminal behavior. *United States v. Comstock*, 627 F.3d 513, 520 (4th Cir. 2010) (on remand). As noted in the Findings of Fact below, the parties stipulate to satisfaction of this prong of the test for a sexually violent person. *See* Paragraph 19C *infra*.

### C.      Current Serious Mental Illness, Abnormality, or Disorder

The Act requires explicitly that the mental illness, abnormality, or disorder of the person sought to be committed be "serious." 18 U.S.C. § 4247(a)(6). Although neither the statute nor the corresponding regulations provide a definition for "serious," the record establishes that it signifies, among other things, that the mental illness, abnormality, or disorder causes a marked impairment in the person's significant spheres of functioning, such as interpersonal, occupational, academic, and social spheres, and results in harm to others. *See, e.g.*, Transcript, Vol. 1 (D.E. 119), at 181:10 to 183:10;198:13-16.

In addition, the Act does not require that to come within its scope a mental illness, abnormality, or disorder be included in the *Diagnostic and Statistical Manual of Mental Disorders* published by the American Psychiatric Association, the current version of which is the fourth edition, text revision dated 2000 ("DSM-IV-TR"), which is "widely recognized as the authoritative reference used in diagnosing mental disorders." *United States v. Wooden*, 693 F.3d 440, 452 n.4 (4th Cir. 2012) (internal quotation marks omitted). As the First Circuit has held, the serious mental illness requirement in the Act is not "delimited by the consensus of the medical

3

community" and "a mental disorder or defect need not necessarily be one so identified in the DSM in order to meet the statutory requirement." *United States v. Carta*, 592 F.3d 34, 39-40 (1st Cir. 2010). The *Carta* court cited the United States Supreme Court holding in *Kansas v. Crane*, 534 U.S. 407, 413 (2002) that "the science of psychiatry, which informs but does not control ultimate legal determinations, is an ever-advancing science, whose distinctions do not seek precisely to mirror those of the law." *Carta*, 592 F.3d at 40 n.2.

### D.    Serious Difficulty Refraining

The "serious difficulty" element "refers to the degree of the person's 'volitional impairment,' which impacts the person's ability to refrain from acting upon his deviant sexual interests." *United States v. Hall*, 664 F.3d 456, 463 (4th Cir. 2012) (citing *Kansas v. Hendricks*, 521 U.S. 346, 358 (1997)). The court must "'evaluate[ ] the individual's present mental condition and the likely prospective effect of that mental condition on his volitional control.'" *Wooden*, 693 F.3d at 460 (quoting *United States v. Francis*, 686 F.3d 265, 275 (4th Cir. 2012)). This inquiry "requires consideration of the grip strength of the mental illness on the inmate—the extent to which the inmate is controlled by the illness." *Id.*

"[T]he 'serious difficulty' language does not require total or complete lack of control, but does require that it must be difficult, if not impossible, for the person to control his dangerous behavior." *United States v. Abregana*, 574 F. Supp. 2d 1145, 1159 (D. Haw. 2008). As the Supreme Court has put it, to meet substantive due process requirements, "this [difficulty], when viewed in light of such features of the case as the nature of the psychiatric diagnosis, and the severity of the mental abnormality itself, must be sufficient to distinguish the dangerous sexual offender whose serious mental illness, abnormality, or disorder subjects him to civil commitment from the dangerous but typical recidivist convicted in an ordinary criminal case." *Crane*, 534

U.S. at 413 (internal citations omitted). Proof of statistical probability of reoffense is not required. *See United States v. Nyhan*, No. 5:12-HC-02101-FL, 2012 WL 5906745, at \*2 (E.D.N.C. Nov. 26, 2012) (quoting *Crane*, 534 U.S. at 413 (recognizing that inability to control behavior will not be demonstrable "with mathematical precision")); *see also United States v. Hunt*, 643 F. Supp. 2d 161, 180 (D. Mass. 2009) ("[T]his court does not construe the 'serious difficulty' criterion for commitment to require proof of any statistical probability of reoffense."); *see generally* 28 C.F.R. § 549.95 (identifying matters that may be considered in determining the serious-difficulty-refraining element).

## II. BURDEN OF PROOF, AND CLEAR AND CONVINCING STANDARD

As indicated, the burden lies with the government to prove each of the elements for civil commitment. *See Comstock*, 130 S. Ct. at 1954; *Hall*, 664 F.3d at 461. It must do so by clear and convincing evidence. 18 U.S.C. § 4248(d); *Comstock*, 130 S. Ct. at 1954; *Hall*, 664 F.3d at 461. "'[C]lear and convincing has been defined as evidence of such weight that it produces in the mind of the trier of fact a firm belief or conviction, without hesitancy, as to the truth of the allegations sought to be established, and, as well, as evidence that proves the facts at issue to be highly probable.'" *Hall*, 664 F.3d at 461 (quoting *Jimenez v. DaimlerChrysler Corp.*, 269 F.3d 439, 450 (4th Cir. 2001)). This standard of proof is an intermediate standard that falls between the "mere preponderance of the evidence" and "beyond a reasonable doubt" standards. *Addington v. Texas*, 441 U.S. 418, 423–24 (1979) (cited in *Hall*, 664 F.3d at 463).

5

**FINDINGS OF FACT**[2]

**I.    RESPONDENT'S SEX OFFENSE AND RELATED HISTORY**

1.  Respondent is currently 50 years old.[3]

2.  On March 2, 1980, Respondent pled guilty to attempt to commit a felony in Tennessee state court.  Gov. Ex. 8, Bates 3508.  Respondent was originally charged with Aggravated Sexual Battery, *Id.*, based on him having unlawful sexual contact with a child under the age of 13 years ld.  Gov. Ex. 7, Bates 3500.  Respondent was sentenced to two years of imprisonment (suspended) and two years of probation.  Gov. Ex. 15, Bates 3604 ¶ 41.  Respondent has stated that, although he did not touch the child sexually, he intended to do so and stopped only after the child appeared nervous.  At the evidentiary hearing held on May 22, 2012, Respondent admitted sexually touching the boy.  Transcript, Vol. 1, at 33:9-13; 21-22.

3.  In March of 1980, Respondent was involved in a motorcycle accident that left him paralyzed below the waist and confined to a wheelchair.  Gov. Ex. 15, Bates 3608 ¶ 56; Transcript, Vol. 1, at 31:9-17.

4.  On February 8, 1990, Respondent pled guilty to sexual assault of a child and indecency with a child in Texas state court.  Gov. Ex. 15, Bates 3605 ¶ 44 to 3606 ¶ 45.  With

---

[2] The findings of fact are those proposed by the government (*see* D.E. 122 at pp. 1-23) subject to several exceptions. First, where the court has made additional findings beyond those proposed by the government, they are set out in one or more paragraphs immediately following the government-proposed paragraph to which they relate and are given the same number as the government-proposed finding but with a letter added.  For example, Paragraph 13A contains additional findings by the court relating to government-proposed Paragraph 13.  Such paragraph numbers are underlined for readability.  The additional findings are used primarily to address responses by Respondent to the government's proposed findings set out in Respondent's proposed supplemental findings and conclusions (D.E. 123) or to provide greater detail regarding the points addressed in the related government-proposed finding.  Second, the court has appended footnotes to a number of government-proposed findings to amplify on points addressed in them. The numbers of such footnotes are underlined. Third, the terminology used for two of Respondent's illnesses, abnormalities, or disorders has been changed in several paragraphs from that proposed by the government as explained in footnotes appended to the initial paragraphs affected.  Fourth and last, the court has made nonsubstantive modifications (*e.g.*, spelling changes, addition of line citations to transcript citations, updating and other revisions of case citations) in a several government-proposed findings.

[3] He was the same age at the time of the hearing.  *See* Ct. Ex. 1 at 1.

respect to the former offense, Respondent touched the genitals and performed oral sex on a 14-year-old male. *Id*. At the time of the offense, Respondent carried a large knife with him and kept locks of hair from children in his apartment. *Id*., Bates 3606 ¶ 44.[4] With respect to the latter offense, Respondent touched the genitals of a male juvenile under the age of 17. *Id*. Respondent was sentenced to 10 years of imprisonment as to both offenses, to be served concurrently. *Id*., Bates 3605 ¶ 44, 3606 ¶ 45. Respondent was released from prison on November 6, 2000. *Id*. Upon his release, Respondent moved to Tennessee to live with his mother. *Id*., Bates 3607 ¶ 52. At the time Respondent committed this offense, Respondent was paralyzed below the waist and was confined to a wheelchair. *See id*., Bates 3608 ¶ 56.

5.  Following his release from prison and between December 2000 and January 2001, Respondent entered the hospital and had kidney stones removed. Transcript, Vol. 1, at 36:24 to 37:5.

6.  In May 2001, Respondent met a 12-year-old boy and his mother at a bookstore in Covington, Tennessee. Gov. Ex. 15, Bates 3598 ¶ 10. Respondent told the mother that he worked with Big Brothers of America and had mentored children who were her son's age. *Id*., Bates 3597 ¶ 9. Shortly thereafter, Respondent and the boy began communicating through the Internet and through e-mail. *Id*., Bates 3598 ¶ 10. In the communications, Respondent posed as a 15-year-old boy named "Josh" in order to prevent the boy's father from learning of their communications. *Id*., Bates 3601 ¶ 17.

7.  In July 2001, Respondent picked up the boy to go on an afternoon outing. *Id*., Bates 3598 ¶ 11. After driving to several locations, Respondent took the boy to a cemetery. *Id*. ¶ 13. On the way to the cemetery, Respondent hypnotized the boy and placed Respondent's hand on

---

[4] Respondent confirmed these facts during his testimony at the evidentiary hearing. Transcript, Vol. 1, at 34:17 to 36:2.

the boy's penis. *Id.* ¶ 12. At the cemetery, Respondent provided the boy with marijuana and asked the boy if he would like to have oral sex. *Id.* ¶ 13. After the boy declined, Respondent took the boy home. *Id.*, Bates 3598 ¶ 13 to 3599 ¶ 14. After this incident, Respondent attempted to contact the boy via phone and e-mail until at least late October 2011. *Id.*, Bates 3599 ¶ 14. On July 12, 2001, Respondent sent a letter to the boy stating that Respondent was "proud to be with [him] on that day . . . . it was uncommonly nice to spend time with such a bright and shining star." *Id.* ¶ 15. The letter also indicated that the boy had said that he loved Respondent. *Id.* The letter also said that Respondent "will always remember" the boy. *Id.*, Bates 3600 ¶ 15.

8. In July 2001, Respondent also posed as the 15-year-old "Josh" to persuade a female friend of the boy to arrange a meeting between the three of them. *Id.* ¶ 16; Transcript, Vol. 1, at 44:6-25.

9. Law enforcement spoke with Respondent, who initially declined knowing the boy or the female referenced in Paragraph 8. Gov. Ex. 15, Bates 3600 ¶ 17. Respondent eventually acknowledged sending the letter referenced in Paragraph 7 and to taking the boy on the outing described in Paragraph 7. *Id.*, Bates 3601 ¶¶ 17, 18. Respondent denied touching the boy sexually. *Id.* ¶¶ 18, 19. Respondent stated that "he had sexual urges but these were under control." *Id.* ¶ 18. Respondent acknowledged that his sexual preference was for young males. *Id.* Respondent also acknowledged asking the boy whether he wanted Respondent to perform oral sex on him. *Id.* ¶ 19.

10. During his interview with law enforcement, Respondent acknowledged having inappropriate sexual urges but stated that he had brought them under control. Transcript, Vol. 1, at 45:12-17. Respondent also acknowledged being infatuated with and romantically and sexually attracted to the 12-year-old boy. *Id.* at 45:18 to 46:6.

11.    Respondent agreed to allow law enforcement to search his computer hard drive. Gov. Ex. 15, Bates 3601 ¶ 20.   Investigators found approximately 115 pornographic images on Respondent's computer, 109 of which depicted teenage males between the ages of 11-20 engaged in sexually explicit conduct.   *Id*., Bates 3602 ¶ 22.   The pornography also included a young boy, approximately 9 years old, in shorts and with his underwear exposed, in a provocative pose.   *Id*.

12.   On June 24, 2002, Respondent pled guilty, in the United States District Court for the Western District of Tennessee, to one count of possession of child pornography and two counts of receipt of child pornography.   Gov. Ex. 13, Bates 556.   On October 4, 2002, Respondent was sentenced to 87 months of imprisonment and three years of supervised release.   *Id*., Bates 557, 558.   At the time Respondent engaged in all of the above-described activities in 2001, he was paralyzed below the waist and was confined to a wheelchair.   Gov. Ex. 15, Bates 3608 ¶ 56; Transcript, Vol. 1, at 46:7-9.

13.    In December 2002, Respondent placed himself in protective custody in FMC Rochester.   Gov. Ex. 5, Bates 3789.    In support of his claim of protective custody, Respondent provided prison officials with a threatening note.   *Id*.   Respondent ultimately acknowledged that he wrote the threatening note.   *Id*.; Transcript, Vol. 1, at 49:3 to 50:9.

13A.   Respondent contends that this incident is irrelevant because it does not involve sexual conduct.   Resp.'s Find. & Conc. ¶ 2.   However, the Fourth Circuit has recognized that a respondent's conduct while incarcerated can be relevant to his sexual dangerousness.   *See* *Wooden*, 693 F.3d at 458.   Psychologist Gary Zinik, Ph.D., who testified for the government, cited this conduct by Respondent as evidence supporting his conclusion that he is sexually dangerous.   Gov. Ex. 2, Bates 3819.   The other psychologist testifying for the government, M.

Lela Demby, Ph.D., also discussed this incident in her report. Gov. Ex. 5, Bates 3789. The court agrees that this incident provides insight into the personality disorder that contributes to Respondent's sexual dangerousness.

14. In 2004, Respondent became sexually interested in another inmate at FMC Rochester. Gov. Ex. 19, Bates 3748. At the time, the inmate was vulnerable and had a fragile mental state. *Id.* Respondent sought to have time alone in the chapel and asked a psychology intern not to tell anyone else of his attempts. *Id.* Respondent later acknowledged his sexual interest in this inmate and said that he liked "young, troubled boys." *Id.*; *see also* Transcript, Vol. 1, at 52:1-16. Psychology staff similarly believed that Respondent attempted to obtain time alone with another young and vulnerable inmate. Gov. Ex. 19, Bates 3748-49.

14A. Respondent argues that his pursuit of the vulnerable inmate is irrelevant because the inmate was not a minor, there purportedly is a camera in the chapel, and Respondent incurred no BOP sanction for this conduct. Resp.'s Find. & Conc. ¶ 3. However, both Dr. Zinik and Dr. Demby deemed Respondent's conduct with respect to the inmate evidence of his sexual dangerousness. Transcript, Vol. I, at 147:7 to 148:15; 208:13 to 210:9. Further, as Dr. Demby explained, Respondent incurred no BOP sanctions because prison officials terminated the interaction between Respondent and the inmate before it rose to a sanctionable level. Transcript, Vol. 2 (D.E. 120), at 102:23 to 104:16.

15. While in federal custody, Respondent has been sanctioned for insolence, abuse/obscene language, lying (twice), and possession of unauthorized items (five times). Gov. Ex. 5, Bates 3789; Gov. Ex. 24, Bates 3580-81.

15A. Respondent contends that the conduct for which he was sanctioned is irrelevant because it has not been shown to involve sexual conduct. Resp.'s Find. & Conc. ¶ 4. As

indicated, however, a person's nonsexual conduct while incarcerated can be relevant to his sexual dangerousness. *See Wooden*, 693 F.3d at 458. Each of the testifying psychologists considered Respondent's history of prison sanctions in their analyses of Respondent's sexual dangerousness. Gov. Ex. 2, Bates 3811; Gov. Ex. 4, Bates 3789; Ct.'s Ex. 2 at 7.

15B. Respondent further contends that a distinction should be made between his conduct while serving his criminal sentence and his conduct while in civil commitment. Resp.'s Find. & Conc. ¶ 4. The court disagrees. Both settings are structured environments in which Respondent's conduct has been closely monitored, and he has faced immediate consequences for violating rules, that is, he has been subject to strong external controls. *See* Transcript, Vol. 1, at 215:9-17. His misconduct in such an environment—whether resulting from a criminal judgment or civil proceedings—provides insight into the extent to which he is likely to engage in misconduct if released and not subject to the external controls the prison environment affords, but more reliant on internal, self-control.

16. Respondent has not participated in any sex offender therapy or treatment program while in the BOP. Transcript, Vol. 1, at 54:5-7; 55:24 to 56:12.

17. Respondent has not completed any sex offender treatment or therapy program. *Id*.

17A. Respondent concedes that he has not completed any sex offender treatment program by the BOP or any other sex offender treatment program. Resp.'s Find. & Conc. ¶¶ 5, 41; Transcript, Vol. 1, at 54:5-7. He argues, though, that he is eager to participate in a sex offender treatment program not run by the BOP if released and has investigated such programs in the Memphis, Tennessee area, the area to which he would be released. Resp.'s Find. & Conc. ¶ 5. The court questions the depth of Respondent's commitment to participate in such a program. He made clear at the hearing that he considers himself to have resolved any problems underlying

11

his offense conduct through reading books and other self-help measures. Transcript, Vol. 1, at 52:24 to 53:5; 53:13-23; 54:23 to 55:8; 55:24 to 56:12. He sees treatment as simply reinforcing the changes he has already made. *Id.* at 55:13-18. Thus, it is not clear that Respondent is open to a program addressing the fundamental problems he actually has. In any event, the fact that Respondent has not received any sex offender treatment is material evidence that he still suffers from any mental illness, abnormality, or disorder he had when he engaged in his offense conduct and thereby that he is at high risk of reoffending. *See, e.g.*, *id.* at 210:17-25; Vol. 2, at 86:10; Gov. Ex. 2, Bates 3828. Respondent offered no evidence detailing the self-help measures he supposedly undertook or showing that such measures are effective in addressing the serious mental illnesses, abnormalities, and disorders he has been found by Drs. Zinik and Demby to have. *See* Transcript, Vol. 1, at 139:20 to 140:5. Dr. Zinik testified that he has never seen a sex offender with problems as serious as Respondent's effectively address them through such self-help measures as Respondent claims he has undertaken. *Id.* at 183:11-25.

## II.    CASE HISTORY

18. On March 9, 2009, a certification of a sexually dangerous person (D.E. 1-2) was filed against Respondent.

19. On May 22 and May 23, 2012, an evidentiary hearing was held before the court to determine whether Respondent is sexually dangerous pursuant to the Act. *See* D.E. 113, 114.

<u>19A</u>. The transcripts of the hearing were filed on October 16, 2012.

<u>19B</u>. The government filed its proposed supplemental findings and conclusions on November 1, 2012 (D.E. 122) and Respondent his proposed supplemental findings and conclusions on November 6, 2012 (D.E. 123).

19C.  Respondent stipulated in the Amended Joint Pretrial Order (D.E. 112) that he "has engaged in and has attempted to engage in child molestation."  Am. Jt. Pre-trial Order 1 ¶ 8.  At the hearing, Respondent confirmed that he stipulated to satisfaction of this prong under § 4248. Transcript, Vol. 1, at 31:21-22; Vol. 2, at 214:25 to 215:3; *see also id.*, Vol. 2, at 199:22 to 220:3 (government's acknowledgment of stipulation).

## III.   RESPONDENT'S TESTIMONY

20.   During his testimony, Respondent acknowledged having current sexual urges,[5] although he claimed that he is only attracted to individuals 30 years old and older.  Transcript, Vol. 1, at 52:24 to 53:5.  Respondent also acknowledged that he could move his hands up and down and that he was able to roll himself into the hearing room using his wheelchair, with assistance.  *Id.* at 55:16-23.

20A.  Although Respondent points to his testimony that he is now attracted to only individuals 30 years old and older as evidence that he is not sexually dangerous, *see* Resp.'s Find. & Conc. ¶ 19, the court gives this testimony little weight, in part, because of Respondent's lack of insight into his mental illnesses, abnormalities, and disorders.  *See, e.g.*, Transcript, Vol. 1, at 139:20 to 140:5.  Also, as indicated, see Paragraph 9 *supra*, he made the somewhat analogous claim to law enforcement after the 2001 interactions with the 12-year-old boy that while he had sexual urges toward young males he had brought them under control, which was clearly not true.  Transcript, Vol. 1, at 45:12-17; Gov. Ex. 2, Bates 3804.  Respondent's credibility generally was undermined by his lack of straightforwardness in discussing some of his prior misconduct, attempts to minimize some of it, and exaggerated expressions of disapproval of other prior misconduct.  *See* Paragraph 41B *infra*.

---

[5] *See* Gov. Ex. 31, Bates 4507 (Oct. 1, 2011 letter by Respondent to convicted sex offender Patrick Szymanski, whom Respondent met when Szymanski was confined at the Federal Correctional Complex at Butner, stating, in part, "Because I'll not be moving for a while, I wish something cute and friendly would come visit!!!").

21.  Respondent has not formulated a detailed relapse prevention plan.  He does not have a clear sense of where he will live or what he will do to refrain from reoffending against children in the future.  At the evidentiary hearing, Respondent indicated that he was trying to live at the assisted care facility currently caring for Respondent's mother.  Transcript, Vol. 1, at 71:10-16.

21A.  Although Respondent contends that he has formulated a "real" relapse prevention plan and release plan, Resp.'s Find. & Conc. ¶ 7; *see also id.* ¶ 46, he did not present any such definitive, detailed plans at the hearing.  *See* Transcript, Vol. 1, at 149:22-24; 150:11-18.  Instead, he addressed various elements that could conceivably be included in such plans.  Respondent's relapse and release planning is clearly inchoate.  Respondent states that "[t]here is no requirement that a civil detainee have a written release and/or relapse plan."  Resp.'s Find. & Conc. ¶ 25.  As Dr. Zinik explained, however, a written relapse prevention plan serves to document that a person has gained the insights into his condition needed to effectively combat relapse (*e.g.*, knowledge of triggers, effective preventive measures) and serves as resource for the person and his support team should he be tempted to relapse.  Transcript, Vol. 1, at 139:20 to 140:5; 149:22 to 150:10.  And while Respondent's release plan remains indefinite, to the extent that it entails Respondent being housed at an assisted living facility, which is his goal, *see id.* at 71:10-16, it would be unsatisfactory because it would give Respondent access to vulnerable populations, *id.* at 219:14 to 220:3.

22.  Between December, 2011, and April, 2012, Respondent has communicated via letter with Patrick Szymanski, a convicted sex offender currently incarcerated in New York.  Gov. Ex. 31, Bates 4510-28; Transcript, Vol. 1, at 58:21 to 59:12.

22A.  Respondent appears to contest the relevancy of his communication with Szymanski.  *See* Resp.'s Find. & Conc. ¶ 8.  But it is manifestly relevant to the sexual

dangerousness of a person with Respondent's sexual history that he is communicating with a convicted sex offender. Respondent could well derive support and justification for his offense conduct from the relationship, if not information on specific techniques to use in pursuing minor victims.

23. As a result of the evidence offered and the parties' stipulations, the court finds that Respondent has committed acts of child molestation.

## IV. EXPERT TESTIMONY

### A. Diagnoses

24. Five experts testified during the evidentiary hearing in this case: Drs. Gary Zinik, Lela Demby, Joseph Plaud, Moria Artigues, and Roscoe Ramsey. Drs. Zinik, Demby, Plaud, and Artigues prepared reports. Drs. Zinik, Demby, and Plaud opined as to Respondent's sexual dangerousness. Dr. Artigues specifically opined as to whether Respondent's current medical status decreases his risk for future sexual reoffending. Dr. Ramsey testified to Respondent's current medical status.[6] All experts interviewed Respondent at some time.

25. Drs. Zinik, Demby, and Plaud agreed that Respondent has engaged in child molestation in the past.

26. Dr. Zinik diagnosed Respondent with: paraphilia not otherwise specified ("NOS"), hebephilia, attracted to adolescent males, nonexclusive type; cannabis dependence by history, in remission in a controlled environment; narcotics dependence (pain medication), in remission in a

---

[6] As Dr. Ramsey testified as an expert in primary care medicine, he did not directly testify regarding the Adam Walsh Act factors.

controlled environment; and personality disorder NOS, with antisocial and narcissistic features.[7] Gov. Ex. 3, Bates 3841-42.

27.    In support of his conclusion that Respondent suffers from paraphilia NOS, hebephilia, Dr. Zinik stated that this condition is a commonly accepted diagnostic category in the clinical and treatment literature on paraphilias. Gov. Ex. 2, Bates 3815. Dr. Zinik reviewed Respondent's sexual offense history and concluded that Respondent has a pattern of grooming and sexually seducing young boys. *Id*., Bates 3817. He noted that individuals such as Respondent seek a romantic relationship with boys as lovers. *Id*.

28.    During the evidentiary hearing, Dr. Zinik testified regarding the empirical evidence that supports the existence of paraphilia NOS, hebephilia. Transcript, Vol. 1, at 107:1 to 119:13. Among other things, Dr. Zinik highlighted research supporting such a disorder. *Id*. at 109:14 to 117:3. Dr. Zinik noted that the DSM-V is currently reviewing whether to include a hebephilic type of diagnosis. *Id*. at 107:4 to 108:21.[8] Dr. Zinik cited clinical evidence in support of such a diagnosis. *Id*. at 117:4 to 119:13. Dr. Zinik also distinguished hebephilic attraction from more normative sexual attractions to post-pubescent individuals. *Id*. at 119:18 to 121:5; 124:1 to 125:25. Dr. Zinik described how those who have paraphilia NOS, hebephilia, develop an "emotional affectionate attachment for these boys . . . [and] are emotionally driven to pursue these relationships." *Id*. at 125:22-25.

29.    Dr. Zinik characterized Respondent's attraction to young boys as "a sexual orientation of a sort" and as "an enduring sexual interest that is a lifelong condition." *Id*. at

---

[7] Based on testimony by Respondent, Dr. Zinik modified in his testimony findings he had made in his report regarding certain features of Respondent's personality disorder, but he otherwise confirmed the diagnosis. *See* Transcript, Vol. 1, at 134:12 to 135:14.

[8] Dr. Zinik testified that his diagnosis of Respondent was valid under the current version of the DSM. Transcript, Vol. 1, at 121:6-19.

126:22-25.  As an example of this enduring interest, Dr. Zinik testified that, during his interview with Respondent, Respondent said "that he was still having sexual thoughts about boys until a few years ago."  *Id*. at 126:25 to 127:2.  Dr. Zinik testified that this condition was serious and that Respondent has "had three cycles of sexual offending involving pubescent boys."  *Id*. at 127:5-10.

30.  Dr. Zinik testified that elements of Respondent's personality disorder NOS "give[] him permission . . . to act more freely on his deviant sexual impulses."  *Id*. at 136:20 to 137:5.

<u>30A</u>.  The diagnosis of personality disorder NOS is one recognized expressly in the DSM-IV-TR.  *See* DSM-IV-TR 729.

31.  Dr. Demby diagnosed Respondent with:  paraphilia NOS; narcotic dependence in a controlled environment (by history); and personality disorder NOS with borderline traits.  Gov. Ex. 5, Bates 3790.  In support of her diagnosis of paraphilia NOS, Dr. Demby referred to Respondent's sex offense criminal history and his admission that he has a preference for young males.  *Id.*

32.  Among other things, Dr. Demby testified that Respondent's paraphilia NOS has caused him "serious impairment in his ability to function . . . .  Mr. Cooke has spent most of his adult life in prison as a result of this repeated sexual contact with young boys."  Transcript, Vol. 1, at 198:12-19.  Dr. Demby also opined and explained how this diagnosis is consistent with the existing DSM.  *Id*. at 200:12 to 201:13.

<u>32A</u>.  Respondent contends that Dr. Demby was defensive in her testimony and, as a government employee, biased in its favor.  Resp.'s Find. & Conc. ¶ 10.  The court disagrees.  It finds that Dr. Demby testified forthrightly, explaining clearly her opinions and citing to ample support for them grounded in the record.  She addressed effectively the challenges to her

17

opinions presented during cross-examination, but that fact obviously does not render her testimony defensive.

33. Drs. Plaud and Artigues[9] did not diagnose Respondent with any sexual or personality disorders. Dr. Plaud did acknowledge, however, that there are individuals who orient themselves toward younger pubescent and post-pubescent people, including those aged 11 to 14. Transcript, Vol. 2, at 43:3-8. Dr. Plaud also acknowledged that, at the time Respondent approached the 12-year-old boy in 2001, Respondent was actively oriented toward a relationship with younger people. *Id*. at 38:20-25. Dr. Plaud also acknowledged that Respondent still has a sexual attraction to young pubescent males. *Id*. at 49:16-19.[10]

33A. The other expert witness, Respondent's treating physician Roscoe Ramsey, M.D., testified regarding Respondent's physical condition, as discussed further below. *See* Paragraphs 46-46B *supra*.

**B.      Current Serious Mental Illness, Abnormality, or Disorder**

34. The court believes that the testimony of Drs. Zinik and Demby is the most credible. As an initial matter, the court concludes that a functional impairment meeting the criteria of paraphilia NOS, hebephilia, as delineated by Drs. Zinik and Demby (which impairment is hereafter referred to as "hebephilia"),[11] is a mental illness, abnormality, or disorder under the Adam Walsh Act. *United States v. Caporale*, No. 12-6832, ___ F.3d ___, 2012 WL 6052021, at

---

[9] At the evidentiary hearing, Dr. Artigues testified that she was not asked to opine on any paraphilia or whether Respondent met criteria for commitment under the Adam Walsh Act. Transcript, Vol. 2, at 135:10-17.

[10] Dr. Plaud thus does not credit Respondent's testimony that he is attracted to only individuals 30 years or older. *See* Transcript, Vol. 1, at 53:2-3.

[11] In its own determinations regarding Respondent's paraphilia, the court is using the generic term "hebephilia" to identify such paraphilia, rather than the DSM terminology "paraphilia NOS, hebephilia," because it takes no position in the controversy over the proper scope of a diagnosis by that name. *See United States v. Caporale*, No. 12-6832, ___ F.3d ___, 2012 WL 6052021, at *7 n.4 (4th Cir. Dec. 6, 2012); Transcript, Vol. 1, at 161:7 to 162:7; 200:12 to 201:13; Vol. 2, at 7:22 to 16:25 (addressing controversy over paraphilia NOS, hebephilia diagnosis). The court has modified the language of this paragraph and other affected paragraphs proposed by the government to accommodate the court's terminology.

*7 (4th Cir. Dec. 6, 2012) ("[T]he scope of 'illness, abnormality, or disorder' in § 4247(a)(6) is certainly broad enough to include hebephilia, by its own or any other name.") (citing *United States v. Carta*, 592 F.3d 34, 38-40 (1st Cir. 2010);[12] *see also United States v. King*, No. 5:10-HC-2009-FL, 2012 WL 4447451, at *3, *6 (E.D.N.C. Sept. 25, 2012) (holding that respondent suffered from a paraphilic disorder characterized by arousal to nonconsent constituting a serious mental illness, abnormality, or disorder under the Act).

35. Dr. Zinik testified credibly regarding the research that supports such a diagnosis.[13] He also testified regarding the deviant and distinguishing features of those suffering from this paraphilia.[14]

36. The court also concludes, based on Respondent's persistent history of offending against pubescent males and his admissions that he has had a sexual interest in young males, that he meets the criteria for a diagnosis of hebephilia. Given that this history of offending has caused distress to his victims and to Respondent, this paraphilia is a serious mental illness, abnormality, or disorder. The court also agrees with Drs. Zinik and Demby that Respondent suffers from a personality disorder and that this disorder is serious. The court also holds that Respondent suffers from narcotic dependence in a controlled environment and cannabis dependence in a controlled environment and that both conditions are serious mental illnesses, abnormalities, or disorders.

---

[12] The decision in *Caporale* renders feckless Respondent's reliance on *United States v. Shea*, No. 5:11-HC-2136-BO, 2012 WL 2786363, at *4 (E.D.N.C. July 9, 2012) ("Given that even the government's experts concede that characterization of hebephilia is a hotly contested issue in the mental health community, the Court finds that it would be inappropriate to predicate civil commitment on a diagnosis that a large number of clinical psychologists believe is not a diagnosis at all, at least for forensic purposes."). *See* Resp.'s Find. & Conc. ¶ 12.

[13] Transcript, Vol. 1, at 106:7 to 119:17.

[14] *See, e.g.*, Transcript, Vol. 1, at 122:8 to 124:14; 181:4 to 182:12.

36A.  Although Drs. Zinik and Demby determined Respondent's personality disorder to have different features, they adequately justified their respective diagnoses.  While the specific features varied between the two psychologists, there is no evidence that these features are mutually exclusive.

### C.  Serious Difficulty Refraining

37.  Drs. Zinik and Demby concluded that, as a result of his paraphilia, Respondent would have serious difficulty refraining from child molestation if released.

37A.  As indicated, Dr. Zinik found that Respondent's personality disorder contributed to his difficulty refraining from child molestation.  *Id.*, Vol. 1, at 136:20 to 137:5; 227:6-16.  Dr. Demby likewise found that Respondent's personality disorder and substance abuse contributed to his difficulty refraining from child molestation.  *Id.*, Vol. 2, at 91:3 to 93:12.

38.  In support of his conclusion regarding Respondent's paraphilia, Dr. Zinik looked to static and dynamic factors.  Respondent's actuarial scores were associated with high-moderate or moderate risk levels.  Gov. Ex. 3, Bates 3843.  Dr. Zinik concluded, among other things, that Respondent has shown a persistence of sexual offending, despite legal consequences, that he has failed to receive sex offender treatment, and that he has shown a pattern of rapid reoffending.  Gov. Ex. 2, Bates 3828.  Dr. Zinik also concluded that Respondent "*thinks and talks* like an untreated sex offender" in that he is "vague, evasive, and lacking insight into his sexual deviance, claims he can't remember details of his offenses except those that appear to reduce his culpability, and defaults to 'the record' which he doesn't dispute but doesn't confirm either."  Gov. Ex. 3, Bates 3840 (emphasis in original); *see also* Transcript, Vol. 1, at 151:1-17.[15]

---

[15] At the hearing, Respondent did confirm some of his conduct but, as indicated, he continued to default to "the record," as Dr. Zinik found in his report.  *See* Paragraphs 20A *supra* and 41B *infra*.

38A.  While the court has considered Respondent's actuarial scores, as reported by each of the testifying psychologists, it has given them less weight than the evidence of his conduct and the testimony of the experts as a whole.  *See United States v. Perez*, No. 5:11-HC-2015-BR, 2012 WL 5493614, at *4 (E.D.N.C.  Nov. 13, 2012) (citing *Wooden*, 693 F.3d at 461 and *United States v. Hunt*, 643 F. Supp. 2d 161, 180 (D. Mass. 2009)).  A unique consideration in this case contributing to the limited weight due the actuarial scores is the absence of evidence that individuals in the samples studied had the type of physical disabilities Respondent does.  *See* Transcript, Vol. 1, at 166:17 to 167:16; Vol. 2, at 71:21-25; 100:11-22.

39.  In support of his conclusion that Respondent would have serious difficulty refraining from future acts of child molestation or sexual violence if released, Dr. Zinik testified that Respondent is "a repeat offender, he's had three cycles of sexual offending, he demonstrates this persistence of sexual offending, he's exhibited rapid sex offending . . . . These are all empirically verified risk factors."  Transcript, Vol. 1, at 175:24 to 176:8.  Dr. Zinik also found relevant Respondent's failure to participate in sex offender treatment and his lack of a formal relapse prevention plan.  *Id*. at 149:13 to 151:17.  Dr. Zinik also testified regarding the importance of having a written relapse prevention plan.  *Id*. at 177:6-14.

40.  In support of her conclusion that Respondent would have serious difficulty refraining, Dr. Demby relied on static and dynamic risk factors.  Dr. Demby agreed with Dr. Zinik as to the STATIC-99R.  With respect to dynamic risk factors, Dr. Demby used the Sexual Violence Risk-20 (SVR-20), which identifies potentially exacerbating risk factors.  In her 2010 report, Dr. Demby identified nine such exacerbating factors.  Gov. Ex. 5, Bates 3796.[16]  Of particular note, Dr. Demby emphasized Respondent's "repeated reoffending despite legal

---

[16] At the hearing, Dr. Demby testified that based on information received since her report she now believed Respondent had 11 exacerbating factors.  Transcript, Vol. 1, at 217:19 to 219:9.

sanctions and restraints upon his behavior." *Id.*, Bates 3795. Dr. Demby also concluded that Respondent "demonstrates extreme minimization and denial of his offenses, as well as attitudes that support his sex offenses." *Id.*, Bates 3796.[17]

41. Among other things, Dr. Demby testified that "at this point [Respondent] remains a stable, untreated sex offender who has yet to receive sex offender specific treatment." Transcript, Vol. 1, at 211:13-15. Dr. Demby testified that Respondent lacks insight into his condition. *Id.* at 211:16 to 212:7. Additionally, Dr. Demby opined that Respondent's paraphilia is driven by an emotional need and, as a result, does not require genital functioning. *Id.* at 212:12 to 213:7. Dr. Demby also expressed concern regarding the limited release plan Respondent has discussed. *Id.* at 219:10 to 220:10.

41A. Respondent points out that Dr. Demby found that he understands the wrongfulness of his behavior. Respondent's Find. & Conc. ¶ 28; Transcript, Vol. 2, at 88:4. But she explained that the concern with a sexually dangerous person evaluation is not whether the offender understands the wrongfulness of his conduct, but whether the person is compelled to engage in it even though he knows that it is wrong and will suffer serious consequences if caught. Transcript, Vol. 2, at 88:5-25.

41B. The other testifying psychologists also found Respondent to understand the wrongfulness of his prior conduct. Transcript, Vol. 1, at 134:22-25; 135:10-12 ; Vol. 2, at 25:20-21; 36:1-2. The court is not convinced. His expressions of disapproval of his prior misconduct seemed exaggerated for one who actually believed them. He made them frequently, often gratuitously, and couched them in particularly extreme terms. *See, e.g.*, Transcript, Vol. 1, at 32:22-24; 33:3-5; 39:13-17; 45:22-25; 52:25 to 53:5; 53:18-23; 55:9-13. Respondent's effusive

---

[17] As noted above, while Respondent was candid at times at the hearing, he continued overall to be less than straightforward about his prior misconduct. *See* Paragraphs 20A *supra* and 41B *infra*.

approach to the wrongfulness of his misconduct contrasted with his frequent reluctance to acknowledge the acts of misconduct themselves in a straightforward manner and instead to simply state that he did not contest what official records said he did. *See, e.g., id.* at 32:16-22; 33:9-13, 21-22; 33:23 to 35:4; 41:17-21; 45:12-25. In addition, in some instances he seemed to minimize or misrepresent his culpability for his prior misconduct. *See, e.g., id.* at 43:18 to 44:25; 46:10-23; 47:14-21. The court's differing view regarding Respondent's credibility does not appear material since Drs. Zinik and Demby both determined him to be sexually dangerous even when crediting his testimony.

42. Drs. Zinik and Demby also considered possible mitigating factors. Both Dr. Zinik and Dr. Demby concluded that, although Respondent is paralyzed below the waist, his health does not mitigate his risk. Both noted that Respondent committed numerous sex offenses after his 1980 accident. Dr. Zinik testified that Respondent's medical conditions were not "protective enough to prevent him from reoffending." *Id*. at 176:13-15. Dr. Zinik noted that Respondent has been able to obtain sexual gratification despite his disabilities. *Id*. at 144:6-19 ("He doesn't get erections or ejaculate and hasn't since he was 17, since his accident occurred, but, again, that didn't stop him from committing these sex offenses in the past.").[18] Dr. Zinik also testified that Respondent's paraphilia is driven by emotion. *Id*. at 146:6-14. Additionally, Dr. Zinik testified that he considered and rejected Respondent's age as a protective factor.[19] *Id*. at 151:18 to 152:21. Dr. Zinik also placed greater weight on Respondent's behavior in the community rather than his behavior while in custody. *Id*. at 186:2-13.

---

[18] Dr. Zinik testified specifically that Respondent appears to retain the ability to engage in the same kind of sexual activity (*i.e.*, masturbation and oral copulation) that he did in the past with pubescent boys. Transcript, Vol. 1, at 187:19 to 188:6.

[19] A protective factor is one that lowers the risk of reoffense. *See* Transcript, Vol. 1, at 143:11-12.

42A.  Notwithstanding Dr. Zinik's testimony, Respondent cites his age as lowering his risk of reoffense.  Resp.'s Find. & Conc. ¶ 18.  As Dr. Zinik explained, age can serve as a protective factor, in part, because of the physical deterioration that occurs over time.  Gov. Ex. 3, Bates 3844.  Because Respondent experienced significant deterioration years ago as a result of his motorcycle accident and still engaged in offense conduct, age has not been shown to be a protective factor for him.  *Id.*; *see also* Transcript, Vol. 1, at 151:18 to 152:21.  Dr. Demby reached the same conclusion.  Gov. Ex. 5, Bates 3796.

43.  Among other things, Dr. Demby testified that she did not find Respondent's medical condition to be a mitigating factor.  Transcript, Vol. 1, at 211:11-15.  Dr. Demby based this conclusion on her review of the records and in consultation with Dr. Ramsey.  *See id.* at 211:4-10.[20]  Dr. Demby also discounted Respondent's recent period of unsanctioned behavior while in custody.  She reached this conclusion because Respondent successfully completed prior periods of incarceration but reoffended sexually shortly after release.  *Id*. at 215:1-4; *see also id.* at 184:1-18.[21]

43A.  Respondent argues that he has not had a hands-on sexual offense in 22 years.  Resp.'s Find. & Conc. ¶ 17.  While he may not have been convicted of such an offense in that time period, in 2001 he touched his 12-year-old victim's penis and sought to orally copulate him.  Thus, this 22-year period does not tend to show that Respondent would lack difficulty refraining from child molestation if released.

44.  Dr. Plaud concluded that Respondent would not have serious difficulty refraining from child molestation if released.  In support of his conclusion, Dr. Plaud relied on the MATS-

---

[20] As indicated, Dr. Demby noted that Respondent's paraphilia is not genital driven, but emotion driven.  Transcript, Vol. 1, at 212:8 to 213:8.

[21] As Dr. Demby noted, the structure of the prison environment may account for this period of no (reported) paraphilic conduct.  Transcript, Vol. 1, at 214:21-25.

1, an actuarial tool. On the MATS-1, Respondent was placed in the "High" category, which is the highest risk category the actuarial uses. Dr. Plaud also cited Respondent's age and his physical condition. As to Respondent's health, Dr. Plaud cited the report of Dr. Artigues.

45. Dr. Artigues concluded that Respondent's current medical problems would greatly reduce Respondent's risk of sexual reoffending. Dr. Artigues did not conduct a physical examination of Respondent and based her medical conclusions on an interview with Respondent and on her review of the expert reports. Ct. Ex. 4 at 1; Transcript, Vol. 2, at 141:8 to 143:2; 149:24 to 150:6.[22] Dr. Artigues acknowledged that she had not reviewed thousands of pages of medical records relating to Respondent. Transcript, Vol. 2, at 139:23 to 141:4; 150:7-19. Dr. Artigues also conceded that Respondent committed sexual offenses even while suffering from many, if not all, of his current medical conditions. *Id*. at 149:4-23. Although Dr. Artigues contended that Respondent's medical condition had recently regressed, she based that conclusion on her interview with Respondent. *Id*. at 149:4 to 150:4. Dr. Artigues also testified that Respondent was at risk to reoffend. *Id*. at 151:3-9.

46. Dr. Ramsey, Respondent's treating physician, also testified. *Id*. at 155:24 to 199:2.[23] Dr. Ramsey testified that Respondent's "chronic medical conditions are not deteriorating and have not deteriorated for the past three years that I have been taking care of him." *Id*. at 172:13-17.

46A. Respondent argues that, as with Dr. Demby's testimony, Dr. Ramsey's was defensive and biased in favor of the government. Resp.'s Find. & Conc. ¶ 46. The court finds the testimony was credible and well grounded in the record.

---

[22] Dr. Artigues testified as an expert in forensic psychiatry and medicine. Transcript, Vol. 2, at 118:10-14.
[23] Dr. Ramsey testified as an expert in primary medical care. Transcript, Vol. 2, at 159:10-16.

46B.  Respondent argues that Dr. Ramsey "has not performed updated diagnostic testing which would provide a current clinical assessment."  *Id.* ¶ 21.  The court finds, though, that the data upon which Dr. Ramsey relied was sufficiently current to support his opinions.

47.  The court concludes that Respondent's persistent history of molesting and attempting to molest males between the ages of 12-14, his failure to complete a sex offender treatment program, his lack of a meaningful release plan or relapse prevention plan, and his recent correspondence with a convicted sex offender support a conclusion that Respondent will have serious difficulty refraining from child molestation if released from custody.  As the Fourth Circuit recently held, when considering whether someone would have serious difficulty refraining from offending in the future, "consideration of the nature of his prior crimes provides a critical part of the answer."  *Wooden*, 693 F.3d at 458.  Respondent's repeated arrests and convictions for molesting young boys "demonstrates that the threat of detection and incarceration have limited deterrent effect."  *Id*. at 462.  Respondent's infractions while in custody—even those not sexual in nature—are also relevant to his sexual dangerousness.  *Id*. at 458.

48.  The court also finds that Respondent lacks insight into his sexual deviance and that such a lack of insight supports the conclusion that Respondent will have serious difficulty in refraining from future acts of child molestation.

48A.  The principal mental illness, abnormality, or disorder resulting in Respondent's serious difficulty in refraining is his hebephilia.  Transcript, Vol. 1, at 138:13-21.  Nevertheless, the court agrees with Drs. Zinik and Demby that Respondent's other serious mental illnesses, abnormalities, and disorders, particularly his personality disorder, contribute to such difficulty.  Transcript, Vol. 1, at 136:20 to 137:5; 227:6-16; Vol. 2, at 91:3 to 93:12.  His substance abuse serves to reduce inhibitions against paraphilic conduct.  Moreover, he used marijuana as part of

his method of seducing his 12-year-old victim in 2001. *See* Transcript, Vol. 1, at 137:23 to 138:1; Gov. Ex. 2, Bates 3810.

49. The court agrees with Drs. Zinik and Demby that Respondent's physical condition does not reduce his sexual dangerousness. Respondent and Dr. Artigues acknowledged that Respondent is generally able to use his hands. The court credits Dr. Ramsey's testimony that Respondent's physical condition is stable. Indeed, Respondent committed almost all of his molestation offenses after the 1980 accident that caused his paralysis. As to other health problems, the court notes that Respondent also suffered from kidney stones prior to the 2001 offense. Paragraph 5 *supra*. The court also discounts the opinion of Dr. Artigues, who failed to conduct a physical examination of Respondent and to review thousands of pages of medical records.

50. The court discounts the testimony of Dr. Plaud. Specifically, the court does not agree that hebephilia cannot qualify as a serious mental illness, abnormality, or disorder under the Adam Walsh Act. *See Caporale*, 2012 WL 6052021, at *7. The court also discounts Dr. Plaud's opinion as to whether Respondent would have serious difficulty refraining from future acts of child molestation, given that Dr. Plaud acknowledges that Respondent was engaged in grooming behavior immediately prior to his arrest for child pornography, Transcript, Vol. 2, at 39:1-9, and given that Respondent has not received sex offender treatment.

50A. In discounting Dr. Plaud's testimony, the court also relies on the other factors cited by Drs. Zinik and Demby as showing that Respondent would have serious difficulty refraining from child molestation, as discussed herein. In particular, the court does not find persuasive Dr. Plaud's criticism of personality disorder NOS as a diagnosis in general and as applied to Respondent. *See* Transcript, Vol. 2, at 18:20 to 19:7; 36:14 to 37:23.

50B.   Respondent points out that Dr. Plaud testified that his past offenses involved decisions by him to engage in the offense conduct, rather than "urges."  Resp.'s Find. & Conc. ¶ 24.   However, as Dr. Demby explained, Respondent's perception that he undertook the misconduct by choice is illusory.  Transcript, Vol. 2, at 94:11 to 98:13.  Instead, Respondent's misconduct resulted from his drive to engage in it that overrode good decision making.  *Id.*

50C.  In support of Dr. Plaud's analysis, Respondent contends that he has the best track record of the experts who have testified in "these cases."  Resp.'s Find. & Conc. ¶ 14.  While the court has considered this contention, it gives it very little weight because, among other reasons, the determinations in individual cases are highly fact specific.

50D.  Both Dr. Plaud and Dr. Demby agree that it is not deviant for an adult homosexual male to be attracted to pubescent boys. This principle is a foundation of Dr. Plaud's opinion that Respondent does not suffer from a mental illness, disorder, or abnormality.   In contrast, Dr. Demby opined that, while such attraction is not deviant, acting on it is when doing so causes impairment in the individual's interpersonal functioning.  Transcript, Vol. 2, at 83:1-11; 93:13 to 94:10; *cf.* Transcript, Vol. 1, at 181:16 to 183:10 (Dr. Zinik's distinguishing between acting and not acting on deviant interest in children).  The court finds Dr. Demby's view clearly the more persuasive in the context of this case.   The conduct by Respondent at issue included his aggressively pursuing, at age 39, a romantic relationship with a 12-year old boy.  Dr. Demby explained that such a relationship by Respondent reflects a serious, deviant disorder because, among other reasons, it puts Respondent at risk of incarceration, is doomed to collapse as the minor matures beyond pubescence and loses his attractiveness to Respondent, and is very harmful to the minor.   Transcript, Vol. 1, at 199:4 to 200:11; 212:23 to 213:7.  Dr. Plaud has not

convincingly shown that Respondent's pursuit of this relationship was, instead, simply the product of poor decision making by Respondent.

50E. The court has considered as a protective factor the three-year term of supervised release Respondent would serve upon release, assuming as the parties do, but without deciding, that the release term was not tolled during the period of his civil commitment. Resp.'s Find. & Conc. ¶ 27; *see United States v. Antone*, No. 5:07–HC–2042–FL, 2012 WL 4450846, at *4 (E.D.N.C. Sept. 25, 2012) (collecting cases upholding and denying tolling during period of civil commitment under the Act); *United States v. Seger*, 849 F. Supp. 2d 76, 79 n.3 (D. Me. 2011) (noting defendant's argument that Sixth Circuit's decision in *United States v. Ossa-Gallegos*, 491 F.3d 537, 543 (6th Cir. 2007) precludes tolling of supervised release during period of civil commitment, but declining to decide issue on jurisdictional grounds). The court finds that any such supervised release would not be adequate to address Respondent's sexual dangerousness in light of the seriousness of his mental illnesses, abnormalities, and disorders and the resulting high degree of difficulty he would have refraining from child molestation. *See, e.g.*, Transcript, Vol. 2, at 77:17-22.

50F. The court is aware that Respondent arguably demonstrated some restraint in connection with the 2001 afternoon outing with the 12-year-old boy by not orally copulating him when the boy refused and then taking him home. But this conduct occurred in the context of his aggressive pursuit of the boy (including his efforts to reestablish contact with him after the outing) and the other evidence demonstrating Respondent's difficulty refraining from child molestation. Respondent's desisting from copulation and his taking the boy home therefore warrants little weight as evidence that he would be able without serious difficulty to refrain from child molestation if released.

29

### D. Summary

51. Based on the testimony of Drs. Zinik and Demby, as well as the other evidence in this case, the court finds by clear and convincing evidence that Respondent has serious mental illnesses, abnormalities, and disorders—namely, hebephilia; a personality disorder[24]; narcotic dependence; and cannabis dependence. The court also finds that, as a result of his serious mental illnesses, abnormalities, or disorders, Respondent would have serious difficulty refraining from future acts of child molestation if released.

## CONCLUSIONS OF LAW

1. Clear and convincing evidence establishes that Respondent has engaged and attempted to engage in child molestation within the meaning of 18 U.S.C. § 4247(a)(5).

2. Clear and convincing evidence establishes that Respondent currently suffers from serious mental illnesses, abnormalities, or disorders within the meaning of 18 U.S.C. § 4247(a)(6)—namely, hebephilia; a personality disorder; narcotic dependence; and cannabis dependence.

3. Clear and convincing evidence establishes that as a result of such serious mental illnesses, abnormalities, or disorders Respondent would have serious difficulty in refraining from child molestation if released within the meaning of 18 U.S.C. § 4247(a)(6).

4. Therefore, clear and convincing evidence establishes that Respondent is a sexually dangerous person within the meaning of 18 U.S.C. §§ 4247(a)(5) and 4248(d), and that he thereby meets the criteria for civil commitment under 18 U.S.C. § 4248(d).

---

[24] As with its determinations regarding Respondent's hebephilia, the court is using the generic term "personality disorder," rather than "personality disorder, NOS" in its determinations regarding Respondent's personality-based illness, abnormality, or disorder, pursuant to principles recognized in *Caporale*, 2012 WL 6052021, at *7 n.4.

## CONCLUSION

For the foregoing reasons, IT IS RECOMMENDED that the court enter an order finding by clear and convincing evidence that respondent is a sexually dangerous person within the meaning of 18 U.S.C. § 4247(a)(5) and committing him to the custody an care of the Attorney General pursuant to 18 U.S.C. § 4248(d).

IT IS ORDERED that the Clerk send copies of this Memorandum and Recommendation to counsel for the respective parties, who have 14 days or such other period as the court may direct in which to file written objections.  **Objections shall identify by paragraph number the specific findings or conclusions of law to which they relate.**  Failure to file timely written objections bars an aggrieved party from receiving a de novo review by the District Judge on an issue covered in the Memorandum and Recommendation and, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Judge.  Any responses to objections shall be filed within 14 days after service thereof on the responding party.

This, the 10th day of December 2012.

James E. Gates
United States Magistrate Judge