IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:09-HC-2034-FL

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | MEMORANDUM OPINION |
| | ) | |
| RANDLE PORTER COOKE, | ) | |
| | ) | |
| Respondent. | ) | |

Upon allowance May 14, 2020, of respondent's motion filed April 9, 2020, for discharge

hearing (DE 220), and after a lengthy discovery period, two-day hearing convened October 21,

2021. Petitioner's motion in limine to exclude the testimony and report of Dr. Andrew A. Young

("Young") (DE 305) also occupied the court's attention at hearing attended by respondent's

counsel James Braxton Craven, III ("Craven") and Lynne Louise Reid ("Reid"), and petitioner's

counsel Genna D. Petre and Mallory Brooks Storus. Respondent made his appearance by

videoconference feed from the Federal Correctional Center in Butner, North Carolina ("FCC-

Butner"). The court reflects here on aspects of case progress to date, memorializes decisions

made at hearing, and outlines a course for the future.


**BACKGROUND**

The issue before the court is whether respondent has shown by a preponderance of the

evidence that he no longer is a sexually dangerous person and therefore can be released from his

civil commitment under the Adam Walsh Act Child Protection and Safety Act of 2006 ("Adam

Walsh Act"), pursuant to 18 U.S.C. § 4247(h). In addition to documentary evidence made a part

of the record, the court received testimony at hearing from the following witnesses offered by respondent: 1) Dr. Gary Zinik, Ph.D. ("Zinik"), petitioner's retained expert; 2) Dr. Joseph Plaud, Ph.D. ("Plaud"), respondent's retained expert; and 3) Young. Respondent also testified on his own behalf. The court received further testimony from the following witnesses offered by petitioner: 1) Patrick Cook, Ph.D. ("Cook"), clinical director for the commitment and treatment program ("CTP") at FCC-Butner; 2) Dr. Lawrence Sichel, M.D. ("Sichel"), respondent's treating physician at FCC-Butner; and 3) Dr. Heather Ross, Ph.D. ("Ross"), Federal Bureau of Prisons ("FBOP") forensic examiner.

The record shows that in March 1980, at age 17, respondent was involved in a motorcycle accident that left him paralyzed below the waist and confined to a wheelchair. Despite his paralysis, between the date of his accident and his federal arrest in March 2002, respondent committed several contact-based sexual offenses against minors ages 11 to 14. On June 24, 2002, respondent pleaded guilty, in the United States District Court for the Western District of Tennessee, to one count of possession of child pornography and two counts of receipt of child pornography. On October 4, 2002, respondent was sentenced to eighty-seven months' imprisonment and three years' supervised release.

Petitioner filed certificate of a sexually dangerous person as to respondent on March 9, 2009. On September 15, 2010, Craven entered notice of appearance as counsel for respondent. Craven has been respondent's primary counsel since that time. After extensive delays pending resolution of litigation addressing the constitutionality of the Adam Walsh Act, respondent's commitment hearing was held May 22 - 23, 2012. On March 18, 2013, the court found respondent

2

was a sexually dangerous person under the Adam Walsh Act and ordered him civilly committed to the custody of the Attorney General.

Respondent, now 59 years old, has been housed at FCC-Butner since his March 2009 certification as a sexually dangerous person. On April 9, 2020, respondent, represented by Craven, moved for discharge hearing pursuant to 18 U.S.C. § 4247(h). Petitioner did not oppose the motion for hearing but requested leave to conduct pre-hearing discovery. The court granted both requests by order entered May 5, 2020. On June 29, 2021, Craven notified the court that Reid would also represent respondent at the hearing on a pro bono basis.

Discovery in the case was protracted and contentious. As pertinent here, respondent retained Young to review his medical records and provide expert opinion as to whether respondent could reoffend sexually given his ongoing medical problems. The timeliness of respondent's disclosure of Young's report and its admissibility at the discharge hearing were the subject of several related discovery motions. Ultimately, on July 30, 2021, the court determined that Young's testimony and report could be offered in evidence at hearing, subject to later exclusion by the court in the event it determined that the testimony did not satisfy the relevance and reliability standards set forth in Federal Rule of Evidence 702 and related case law. On August 5, 2021, the court granted petitioner's motion to reopen discovery to depose Young or take written discovery from him.

On October 14, 2021, one week prior to the scheduled hearing, petitioner filed the instant motion in limine again seeking exclusion of Young's testimony and report pursuant to Federal Rule of Evidence 702 based on new information obtained during the supplemental discovery period. Petitioner argues that the court should exclude Young's testimony and report for the

Case 5:09-hc-02034-FL   Document 315   Filed 10/28/21   Page 3 of 17

following reasons: 1) Young lacks the experience, training, and knowledge to opine as a medical expert; 2) his testimony would be unhelpful and confusing to the court; and 3) his conclusions are not based on experience, methodology, research, or data. The court ordered expedited response, which respondent timely filed on October 18, 2021. Hearing got under way three days later.

## COURT'S DISCUSSION

A.    Legal Standard

The Adam Walsh Act established a program for civil commitment of individuals in the custody of the FBOP, and others, who are determined to be "sexually dangerous person[s]." 18 U.S.C. § 4248(d). An individual committed under the Act may request discharge hearing pursuant to 18 U.S.C. § 4247(h), provided the motion is not filed within 180 days of a court determination that he is sexually dangerous. At the discharge hearing, respondent must demonstrate by a preponderance of the evidence that he no longer is a sexually dangerous person, or will not be sexually dangerous if released under a prescribed regimen of medical, psychiatric, or psychological care or treatment. 18 U.S.C. §§ 4247(h), 4248(e); see United States v. Shea, 989 F.3d 271, 276 (4th Cir. 2021) ("To obtain a discharge, the committed person carries the burden to show by a preponderance of the evidence that he is no longer sexually dangerous.").

A "sexually dangerous person" is one "who has engaged or attempted to engage in sexually violent conduct or child molestation and who is sexually dangerous to others." 18 U.S.C. § 4247(a)(5). The phrase "sexually dangerous to others" means that "the person suffers from a serious mental illness, abnormality, or disorder as a result of which he would have serious

4

difficulty in refraining from sexually violent conduct or child molestation if released."  18 U.S.C.
§ 4247(a)(6).

Thus, at the initial commitment hearing, petitioner must show that respondent 1) has previously "engaged or attempted to engage in sexually violent conduct or child molestation";  2) currently "suffers from a serious mental illness, abnormality, or disorder"; and 3) "as a result of" such condition, "would have serious difficulty in refraining from sexually violent conduct or child molestation if released." 18 U.S.C. §§ 4247(a)(5), (6), 4248(d); see also United States v. Comstock, 560 U.S. 126, 130 (2010).  To obtain discharge pursuant to § 4247(h), respondent must show by a preponderance of the evidence that one of the foregoing conditions no longer applies, or would not apply if the court released him on a prescribed regimen of medical, psychiatric, or psychological care and treatment.  See 18 U.S.C. § 4248(e); Shea, 989 F.3d at 276.  "The burden of showing something by a 'preponderance of the evidence,' . . . simply requires the trier of fact 'to believe that the existence of a fact is more probable than its nonexistence before he may find in favor of the party who has the burden to persuade the judge of the fact's existence."  Concrete Pipe & Prods. of California, Inc. v. Constr. Laborers Pension Tr. for S. California, 508 U.S. 602, 622 (1993) (alterations omitted) (quoting In re Winship, 397 U.S. 358, 371–72 (1970) (Harlan, J., concurring)).

Case 5:09-hc-02034-FL   Document 315   Filed 10/28/21   Page 5 of 17

B.      Analysis

The parties stipulated that prong one is satisfied here, and respondent's historical offense conduct establishes he has engaged in prior acts of child molestation.   (See Pet'r's Ex. 9 at 3-8). That stipulation is true.   Prong one is established in this case.

Prong two addresses whether respondent currently suffers from a serious mental illness, abnormality, or disorder.   18 U.S.C. § 4247(a)(6); Comstock, 560 U.S. at 130.   The second prong requires examination of the psychiatric diagnoses proffered by the experts.   Such diagnoses, however, are "merely the starting point for the court to consider the true thrust of the § 4247(a)(6) inquiry – whether, on a case-specific basis, the respondent's underlying condition constitutes a serious functional impairment."   United States v. Caporale, 701 F.3d 128, 137 n.4 (4th Cir. 2012).

Zinik and Ross diagnosed respondent with other specified paraphilic disorder, nonexclusive type, also known as hebephilia.   Hebephilia is similar to pedophilic disorder, except that the attraction is to pubescent as opposed to prepubescent minors.   See id. at 133 (describing criteria for diagnosis of hebephilia); (see also Pet'r's Ex. 9 at 23 (explaining hebephilia is the same as pedophilic disorder with the exception that the attraction is to pubescent minors, generally ages 11 to 14))   The criteria for hebephilia is summarized below:

> A.      Over a period of at least 6 months, recurrent, intense sexually arousing fantasies, sexual urges, or behaviors involving sexual activity with a [pubescent minor or minors].
>
> B.      The individual has acted on these urges, or the sexual urges or fantasies cause marked distress or interpersonal difficulty.
>
> C.      The individual is at least 16 years and at least 5 years older than the child or children in Criterion A.

Case 5:09-hc-02034-FL   Document 315   Filed 10/28/21   Page 6 of 17

(See Plaud Report (DE 218-1) at 15 (describing criteria for pedophilic disorder, modified herein for hebephilia)). Hebephilia, if accompanied by the requisite evidence of functional impairment, can satisfy the second prong of the § 4248 analysis even though the condition is not a recognized DSM-V diagnosis. Caporale, 701 F.3d at 137 n.4.

The court finds respondent suffers from hebephilia. Respondent has sexually molested two 12-year-old males, one 14-year-old male, and a fourth male under the age of 17. (See Pet'r's Ex. 9 at 3-8) Respondent also possessed child pornography depicting teenage males between the ages of 11 and 20. (Id.). Moreover, respondent has reported approximately six unreported victims, some as young as 14. (Id. at 21). Respondent has demonstrated sexual attraction to pubescent children between the ages of 11 and 14 for the entirety of his adult life, he has acted on such attraction, and the disorder has caused extensive functional impairment, including a ten-year state prison sentence in Texas and a seven-year federal prison sentence.

Plaud opined that prong two is not satisfied in this case where respondent does not currently suffer from a relevant mental disorder. The court found Zinik and Ross's opinions with respect to prong two were more well-reasoned, plausible, internally consistent, and supported by the record for the reasons set forth above. Accordingly, respondent has not established by a preponderance of the evidence that he no longer suffers from a serious mental illness, abnormality, or disorder.[1]

The court turns now to prong three. To meet his burden on prong three, respondent must prove by a preponderance of the evidence that he no longer would have serious difficulty refraining from sexually violent conduct or child molestation if released. 18 U.S.C. §§ 4247(h), 4248(e);

---

[1] In light of this finding, the court does not address whether the additional diagnoses offered by some of the experts, including antisocial personality disorder and certain substance use disorders, independently satisfy prong two.

7

<u>Shea</u>, 989 F.3d at 276. "[T]he 'serious difficulty' prong of § 4248's certification proceeding refers to the degree of the person's 'volitional impairment,' which impacts the person's ability to refrain from acting upon his deviant sexual interests." <u>United States v. Hall</u>, 664 F.3d 456, 463 (4th Cir. 2012) (quoting <u>Kansas v. Hendricks</u>, 521 U.S. 346, 358 (1997)). In other words, "civil commitment statutes [that] have coupled proof of dangerousness with the proof some additional factor, such as a 'mental illness' or 'mental abnormality' . . . serve to limit involuntary civil confinement to those who suffer from a volitional impairment rendering them dangerous beyond their control." <u>Kansas</u>, 521 U.S. at 358.

In evaluating the third prong, the court considers the following factors: 1) history of acting on pedophilic urges or deviant sexual interests; 2) continued high-risk behavior; 3) failures while on supervision; 4) resistance to treatment; 5) continued deviant thoughts; 6) cognitive distortions; 7) actuarial risk assessments and dynamic risk factors; 8) impulsiveness; and 9) historical offenses. <u>See</u> <u>United States v. Wooden</u>, 693 F.3d 440, 459, 462 (4th Cir. 2012). The court also examines respondent's age, offense-free time in the community, ability to comply with institutional rules, commitment to controlling deviant behavior, respondent's testimony regarding volitional control, and supervised release conditions. <u>Hall</u>, 664 F.3d at 464-67.

Many of the <u>Wooden</u> factors support a finding of volitional impairment. Respondent has a lengthy history of acting on his deviant sexual interests and his historical offenses establish that he lacked volitional control when he was last in the community. Moreover, prior to early February 2021, respondent was largely resistant to treatment. Although respondent testified that he had engaged in "bibliotherapy" on his own, his studies were not supervised by a treatment provider, and Ross, Zinik, and Cook testified that respondent's "bibliotherapy" would not be

8

considered valid sex offender treatment. Respondent's scores on the Static-2002R and the Static 99-R also place him in the above or well-above average risk of reoffense. (See Pet'r's Ex. 5 at 10; Pet'r's Ex. 9 at 27-28).

Ross and Zinik examined dynamic risk factors pertaining to the likelihood of respondent reoffending sexually. Ross, for example, identified that respondent exhibits sexual preference for young males, grievance thinking, emotional congruence with children, offense-supportive attitudes, lack of emotionally intimate relationships with adults, and negative social influences. Zinik identified sexual preoccupation (in the community), lifestyle impulsiveness (in the community), poor problem solving (in the community), attitudes supporting sexual offending, and negative social influences. Zinik further opined that factors indicative of respondent's risk of reoffense include that respondent has not lived in the community for a significant period of time without offending sexually, and respondent did not participate in structured sex offender treatment prior to February 2021.

However, Zinik noted mitigating factors to the risk of reoffense include respondent's approaching age 60 and his declining physical health. Cook also testified to risk factors respondent exhibited relevant to his risk of reoffense. Specifically, Cook was concerned about respondent's resistance to rules and supervision and his grievance thinking. With respect to respondent's physical health, Sichel testified that while respondent has suffered periodic setbacks his health overall has been stable throughout his commitment.

The court also considered respondent's testimony and expert testimony which demonstrated that respondent honestly discussed and took responsibility for his past sexual offenses. Moreover, although respondent refused to engage in sex offender treatment prior to

9

February 2021, since then he has successfully engaged in CTP at FCC-Butner.

Cook testified to his favorable impression of respondent's commitment now to involvement in that program, where he is on track to finish phase I by the end of this year. Respondent's formal risk assessment, underway at time of hearing, will be completed by then. Cook testified that respondent could make significant progress in phase II of CTP after approximately three or four months of treatment in that phase. Cook offered insight into changes made to CTP under his authority and direction, taking into consideration, among other things, evolving science in this area, with the overriding goal of making best use of time and resources, to most efficiently and effectively provide treatment.

Plaud testified that respondent's risk of recidivism is low. Specifically, Plaud indicated that respondent exhibited behavioral stability and control while incarcerated and committed and demonstrated ability to monitor himself. According to Plaud, the absence of disciplinary infractions or similar reports of inappropriate sexual behavior during his incarceration or commitment evinces volitional control. Plaud noted that while respondent had not been a participant in CTP, this factor was not used in his risk assessment because respondent had been at low risk of reoffending since he was committed.

Having considered the evidence, where respondent's hard work is in progress now, it cannot be said yet that he is a treated offender. The single tool respondent has now to aid in his restraint, as that relates to the third prong, is avoidance. Evidence shows that avoidance may not be available, or even realistic, in many risky situations. Attempted reliance on it alone likely would result in a severely isolated existence, too, where, for example, respondent contemplated in testimony undertaking basic shopping activities at extreme hours so as not to put himself in a

position of encountering a child.

Certain witnesses spoke of a "tool box" in testimony, conjuring imagery of the successful release candidate in possession of multiple tools or skills able to be employed to live an integrated life outside the walls of FCC-Butner. Respondent appears committed to adding necessary tools or skills.

If the court had to determine whether or not respondent has met his burden on prong three, and shown by a preponderance of the evidence at this time he no longer will have serious difficulty refraining from sexually violent conduct or child molestation if released, on today's record, it would be compelled to conclude no, he has not. Respondent's offense patterns demonstrate lack of volitional control, the static and dynamic risk analyses point to a high risk of reoffense, and while now in treatment one cannot say he is a treated offender. But given what is underway with his participation in CTP at FCC-Butner, and with regard to the record in this case now developed together with what may be shown upon his further, successful treatment, it is expected that respondent will position himself in the not too distant future to show by a preponderance of the evidence that he is not sexually dangerous.

So instead of denying the motion for discharge outright and requiring respondent to reapply for discharge 180 days from now, see 18 U.S.C. § 4247(h), accompanied by a potentially lengthy discovery period and further delay scheduling the hearing, I determined that continuance of the hearing to a date certain, April 25, 2022, is the appropriate course. This continuance positions respondent to supplement the record with additional information upon completion of phase I by the end of this year together with the risk assessment, and to make and show, as anticipated by Dr. Cook and this court, significant progress in phase II of CTP after approximately three or four

Case 5:09-hc-02034-FL   Document 315   Filed 10/28/21   Page 11 of 17

months of treatment. This procedural tack is taken, too, with regard to respondent's health issues, age, and the length of time he has been committed.

C.    Motion in Limine (DE 305)

Petitioner mounted challenge to Young's testimony on the back of Federal Rule of Evidence 702, which governs admissibility of expert opinion testimony.   Under Rule 702, expert testimony is appropriate when "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue."   Fed. R. Evid. 702.   A witness qualified as an expert may be permitted to testify where "(b) the testimony is based upon sufficient facts or data, (c) the testimony is the product of reliable principles and methods, and (d) the expert has reliably applied the principles and methods to the facts of the case." Id.    It is well-established that Federal Rule of Evidence 702 imposes a "basic gatekeeping obligation" upon a trial judge to "ensure that any and all scientific testimony is not only relevant, but reliable."   Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147 (1999); Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 592–93 (1993).   "The proponent of the testimony must establish its admissibility by a preponderance of proof."   Cooper v. Smith & Nephew, Inc., 259 F.3d 194, 199 (4th Cir. 2001).

Young is an accomplished medical professional and one reasonably could envision a set of circumstances where his opinions would meet relevant criteria.   But his testimony in this instance was discounted for a different reason – respondent's misguided gamesmanship.   Respondent's counsel seized on some perceived strategic advantage thought to accrue to that side by withholding from the other side Young's marital relationship with the attorney conducting his direct examination, leading him at times, depriving petitioner from testing the witness's opinions with

12

regard to any interest or disinterest in the case outcome related to that relationship.

While the court does not have the transcript yet in hand, when the fact of that relationship was revealed, the court recalls a host of sorry responses from respondent's counsel along lines: 1) "I thought it came out in his deposition;" [2] 2) "People in the Federal Public Defender's office know so I figured you would too;" 3) "We all walked into the courtroom together so I thought it was obvious;" and 4) "I asked if we should tell and co-counsel said no and I relied on counsel."

The court took some pity on the witness himself and the charade that unfolded around him. Surely a witness married to a lawyer in a case can provide expert testimony. Marriage is not a disqualifier (though respondent's actions suggest a wrongful belief otherwise). But the opposition should have the opportunity to test expert opinions in the light of a witness's relationship, if any, to one side or the other, and the witness's interest or disinterest in the case outcome. Intentionally withholding the fact of marriage to avoid disclosure of the expert witness's bond to his presenter and questioner on direct, and subsequent testing of the witness's impartiality and independence, demeans the legal process.

Young's testimony, a result of his review of thousands of pages of medical record, was struck by the court on account of respondent's ill conceived tactic in litigation, on the court's own initiative, rendering petitioner's motion moot. In the alternative, had Young's testimony remained to be considered, the court would have discounted his opinion that respondent's medical condition makes him unable to reoffend if he should ever want so to do. Where oral copulation and manual stimulation are demonstrated methods of offending in this case, there is little if anything in the medical records to suggest respondent would be unable to apply his mouth or hands

_____

[2] Petitioner's counsel vehemently responded at hearing that this fact was not revealed to them at deposition and they had no inkling of the relationship.

as before.

D.    Representation of Respondent

At hearing, the court determined that respondent should be appointed new counsel.   While the court commends Craven for his longstanding representation of respondent, and the obvious concern he has for this and other clients' well-being demonstrated over counsel's long and distinguished career, in this case the record is replete with instances where Craven seemingly has added fuel to respondent's grievance thinking.

For example, Ross described specific emails respondent sent on January 22 and 26, 2021, that discuss Craven.   On January 22, 2021, respondent sent an email stating:

> Have you talked to [Craven] or has Grzz told you about this Nazi encampment?
>
> It is hardly believable to see how far this thing has deteriorated and all of the lies we are continually told . . . We need a lawyer that really wants to tear down this place and the liars that are running it.   Any ideas?   These people have NO ethics, yet they expect us to hold to moral and ethical standards.   I am always going to be straight with them and I think they hate it.
>
> "The TRUTH loves the light of day – but a lie hates it[,]" and there is a bunch of light that MUST be shone on this place and the folks running it

(Pet'r's Ex. 5 at 3).   On January 26, 2021, respondent wrote the following:

> Things here are falling apart.   It looks like I am going to be moved down to North Carolina Unit because I don't think [Craven] wants me involving myself in this new program [that] PROMOTES discrimination and segregation.  If you don't join, then you are punished by being placed away from everyone you have built relationships with over the past 12 years (as it has been for me).   Being stuck down there with people like [names of several other respondents] and whatever other person they decide to throw down there who either does not enter "P3" – their designation for the "Look and See" supposed volunteer class which they hold you accountable for if you leave and put you down as "quitting the program" for the courts.   But I am going to do what I must.
>
> Right now I am in the middle of trying to get my hearings from LAST YEAR, so until that happens, I can only wait.   Zinik STILL has not given us his report!!!

14

Id.

Ross testified that Craven is now a negative influence on respondent and hindering respondent's treatment progress. The court must agree. Based on the foregoing, and for the reasons set forth additionally at hearing, respondent was told that going forward, he no longer can communicate with Craven about FCC-Butner, CTP related matters, and/or any other aspects of his civil commitment at least up to and until April 25, 2022, or when the court makes its decision on the third prong outstanding. This does not deprive respondent, however, of opportunity to communicate with Craven about 1) representation the lawyer kindly is providing not related to this case of or relating to respondent's claim to some disability benefits or 2) preservation by Craven, as disclosed at hearing, of respondent's inherited funds on respondent's behalf.

Both Craven and associated, pro bono counsel Reid, now relieved of representational responsibilities in the case, shall expedite turnover of legal materials in their custody reasonably needed by new counsel to be appointed by the Federal Public Defender. The court is confident Craven and Reid will do everything within their powers to facilitate orderly transition to new counsel and expresses its appreciation for these efforts.

D.     Future Course

New counsel immediately shall be appointed by the Federal Public Defender. The parties next shall come before the court for video status conference **November 8, 2021, at 1:30 p.m**. Respondent, new counsel, and petitioner all shall be present. The clerk's notice will follow providing conference connection information.

In preparation for this conference proceeding, to be held in the spirit of Rule 16, Fed.R.Civ.Pro., counsel shall confer and consider agenda items, and in so doing, respondent's new

counsel shall not hesitate to invite input of former counsel to the extent either attorney wishes to suggest agenda items based on his or her knowledge and understanding of the case, as a part of the orderly transition in representation made mention of above. Proposed agenda items shall be submitted by **10:00 a.m. on the day of conference** if not before. The court intends then also to discuss and consider a schedule for future periodic status conferences as may be necessary prior to continuation of hearing April 25, 2022.

## CONCLUSION

In sum, and for the reasons stated herein and at hearing October 21 - 22, 2021:

1. Discharge hearing related to the court's prong three determination and whether respondent has shown by a preponderance of the evidence he can be released is CONTINUED to **April 25, 2022;**

2. Petitioner's motion in limine (DE 301) is DENIED as MOOT;

3. Respondent's counsel are relieved of representational duties, and the Federal Public Defender shall appoint new counsel in this matter <u>as soon as possible</u> if not already done;

4. Respondent shall limit communication, if any, with Craven as proscribed;

5. Status conference will convene by video **November 8, 2021, at 1:30 p.m.**; and

16

6.  The parties shall confer and provide suggested conference agenda items to the court **by or before 10:00 am, November 8, 2021**.

This the 28th day of October, 2021.

LOUISE W. FLANAGAN
United States District Judge